1  Joel E. Elkins (SBN 256020)
jelkins@weisslawllp.com
2  **WEISSLAW LLP**
611 Wilshire Blvd., Suite 808
3  Los Angeles, CA 90017
Telephone: 310/208-2800
4  Facsimile: 310/209-2348

5  *Attorneys for Plaintiff*

6  ## UNITED STATES DISTRICT COURT

7  ## NORTHERN DISTRICT OF CALIFORNIA

8

9  BARBARA WOLFSON, Derivatively on Behalf of
EARGO, INC.,
10
                        Plaintiff,
11
          vs.
12
CHRISTIAN GORMSEN, JOSHUA MAKOWER,
13  DOUGLAS J. HUGHES, NINA LOUISE
RICHARDSON, KATIE J. BAYNE, PETER TUXEN
14  BISGAARD, A. BROOKE SEAWELL, and DAVID
WU,
15
                        Defendants,
16
          and
17
EARGO, INC.,
18
                        Nominal Defendant.
19

Case No.:

**VERIFIED STOCKHOLDER
DERIVATIVE COMPLAINT**

**DEMAND FOR JURY TRIAL**

20

21          Plaintiff Barbra Wolfson, by her undersigned attorneys, respectfully submits this Verified

22  Stockholder Derivative Complaint.  Plaintiff makes these allegations upon personal knowledge

23  with respect to herself and, as to all other matters, upon information and belief developed from the

24  investigation and analysis by Plaintiff's counsel, including a review of publicly available

25  information, filings by Eargo, Inc. ("Eargo" or the "Company") with the U.S. Securities and

26  Exchange Commission (the "SEC"), press releases, news reports, analyst reports, investor

27

28                                      1

conference transcripts, publicly available filings in lawsuits, and other information regarding Eargo.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations after a reasonable opportunity for discovery.

# I.    NATURE OF THE ACTION

1.    This is a stockholder derivative action brought by Plaintiff on behalf of nominal defendant Eargo against the members of its Board of Directors (the "Board" or the "Individual Defendants") for their breaches of fiduciary duty and violations of the Federal securities law, which resulted in material damage to the Company and irreparably harmed its reputation.

2.    Eargo is a medical device company focused on the hearing aid industry with a unique direct-to-consumer approach.  Unlike conventional hearing aids, no audiologist or clinical visit is required, which lowers the costs and reduces the delays for consumers when being fitted for hearing aids.  Also, unlike conventional hearing aids, due to their lower cost, benefit allowances from certain third-party payors, such as federal insurance programs, cover much of the price for Eargo hearing aids.  Eargo contacts these insurance providers directly, eliminating the need for customers to interface directly with insurers.

3.    Eargo conducted its initial public offering ("IPO") pursuant to a Registration Statement declared effective by the SEC on October 15, 2020 (the "Registration Statement").  The Prospectus for the IPO (together with the Registration Statement, the "Offering Materials") was signed by all but one of the Individual Defendants.

4.    The substantial risks posed by the Company's unique business model were set out in the Offering Materials and other documents signed by the Individual Defendants, demonstrating their awareness both of these substantial risks and their fiduciary duty to oversee and manage those risks for the benefit of the Company and its stockholders.  In order to properly oversee those risks, the Individual Defendants were required to implement and maintain an effective system of internal controls, but the Offering Materials and subsequent filings with the SEC, disclose that the Company had a material weakness in its internal controls.

5.      The Individual Defendants' failure to perform their fiduciary duties has caused substantial damage to Eargo.  That damage began to be revealed in May 2021, when only seven months after launching its IPO, Eargo disclosed a "routine audit" by its largest third-party payor. A few months later, in August 2021, Eargo further disclosed that the insurance company conducting the "routine audit" did not reimburse any claims submitted by Eargo since March 2021 and that its accounts receivable had ballooned to $15,361,000, up from less than four million dollars at the end of fiscal year 2020.  Eargo's stock lost a quarter of its value upon that disclosure.

6.      In a call with financial analysts, Defendant Christian Gormsen ("Gormsen"), the Company's President, CEO, and a member of the Board of Directors, attempted to assuage concerns about the audit, representing that the audit was part of an "educational process" which would ultimately lead to an "opportunity to further broaden our insurance coverage."  About a month later, Gormsen's representations were given the lie when Eargo disclosed in its public filings that the United States Department of Justice (the "DOJ") had opened an investigation into Eargo's insurance claims and was overseeing the audit of the claims submitted as part of the federal insurance program.  Following the news of the federal investigation, the Company's stock lost more than two-thirds of its value in one day.[1]

7.      In the wake of these revelations and Eargo's plummeting stock price, securities class action lawsuits were filed against the Company and all but one of the Individual Defendants for their false and misleading statements and material omissions that artificially inflated the price of Eargo stock.  Eargo will now be subject to substantial costs defending itself and the Individual Defendants in these lawsuits and investigations and is exposed to substantial liability.

8.      Plaintiff seeks to hold the Board accountable for its breaches of fiduciary duty in failing to: (1) implement and maintain an effective system of internal controls designed to ensure the Company's compliance with laws, rules, and regulations governing Eargo's core operations;

---

[1]      *See* Tomi Kilgore, MarketWatch, https://www.marketwatch.com/story/eargo-stock-plummets-to-record-low-as-the-former-hot-ipo-is-now-a-target-of-a-doj-criminal-probe-11632425046 (last visited Nov. 17, 2021).

(2) implement and maintain an effective system of internal controls over financial reporting and public statements made by the Company's officers; (3) implement and maintain effective internal controls and corporate governance practices and procedures to effectively oversee the material risks posed to the Company; and (4) investigate and take action when presented with red flags that the internal controls over the Company's insurance claim process and financial reporting were inadequate.

9. Eargo's directors are neither disinterested nor independent. As such, demand upon them would be futile and is excused. In the absence of this action, Eargo will neither recover its damages nor properly remediate the weaknesses in its internal controls and corporate governance practices and procedures.

## II.    JURISDICTION AND VENUE

10. The claims asserted herein arise under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated thereunder. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

11. This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.

12. This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this District where the Company maintains its principal executive offices.

III.   **PARTIES**

   A.   **Plaintiff**

   14.   Plaintiff Barbara Wolfson purchased Eargo stock in the Company's IPO and has held Eargo stock continuously since that time.  As such, Plaintiff was a shareholder at the time of the transactions complained of herein.

   B.   **Defendants**

      1.   **Nominal Defendant Eargo, Inc.**

   15.   Defendant Eargo is incorporated under the laws of Delaware with its principal executive offices located at 1600 Technology Drive, San Jose, California 95110.  Eargo's common stock trades on the NASDAQ exchange under the symbol "EAR."

      2.   **Individual Defendants**

         a.   **Defendant Gormsen**

   16.   Defendant Gormsen is the President and Chief Executive Officer ("CEO") of Eargo since June of 2016 and a director since November of 2014.  Early in his career, he was a consultant in the Corporate Finance and Strategy Practice group of McKinsey & Company, a management consulting firm.

   17.   As of August 1, 2021, Gormsen beneficially owns 1,206,386 shares of the Company's stock.  According to the Company's proxy statement filed with the SEC on September 24, 2021 (the "2021 Proxy Statement"), Defendant Gormsen received the following compensation over the past two years:

|      | Salary   | Bonus    | Option Awards | Non-Equity Plan Compensation | Other Compensation | Totals      |
|------|----------|----------|---------------|------------------------------|--------------------|-------------|
| 2020 | $452,279 | $61,982  | $3,149,564    | $147,911                     | N/A                | $3,811,736  |
| 2019 | $502,170 | N/A      | $1,022,911    | N/A                          | N/A                | $1,525,081  |

         b.   **Defendant Makower**

   18.   Defendant Joshua Makower ("Makower") is Eargo's Chairman of the Board, having become a Company director in 2015, and serves as a member of its Audit Committee and

its Nominating and Corporate Governance Committee.  He is the founder and Executive Chairman of ExploraMed, a medical device incubator that created nine companies over the past 25 years, including Neotract, which he co-founded and serves as its Chairman of its Board.  Makower is a Special Partner on the healthcare team at New Enterprise Associates ("NEA"), a global venture capital firm, and has worked closely with NEA since 1995, serving as a General Partner to lead its medtech/healthtech practice from 2015 to 2021.  NEA partnered with ExploraMed in successfully developing eight companies, including Neotract.  Makower also serves as a director of Ceterix Orthopedics Inc ("Ceterix").

19.     As of August 1, 2021, Makower beneficially owns 6,619 shares of the Company's stock.  According to the 2021 Proxy Statement, Defendant Makower received total compensation from the Company of $143,738 for fiscal year 2020 including $23,750 for fees earned or paid in cash and $119, 988 in stock option awards.

### c.     Defendant Hughes

20.     Defendant Douglas J. Hughes ("Hughes") is a Company director since 2020 and is a member of its Audit Committee.  Hughes was Chief Financial Officer ("CFO") of Neotract, which was co-founded by Defendant Makower, for seven years.

21.     As of August 1, 2021, Hughes beneficially owns 45,545 shares of the Company's stock.  According to the 2021 Proxy Statement, Defendant Hughes received total compensation of $181,535 for fiscal year 2020 including $12,500 for fees earned or paid in cash and $169,035 in stock option awards.

### d.     Defendant Richardson

22.     Defendant Nina L. Richardson ("Richardson") is a Company director since September 2020 and a member of its Compensation Committee. Richardson also serves on the board of ExploraMed.

23.     As of August 1, 2021, Richardson beneficially owns 47,554 shares of the Company's stock.  According to the 2021 Proxy Statement, Defendant Richardson received total

compensation of $180,910 for fiscal year 2020 including $11,875 for fees earned or paid in cash and $169,035 in stock option awards.

### e. Defendant Bayne

24. Defendant Katie J. Bayne ("Bayne") is a Company director since June 2021 and is a member of its Nominating and Corporate Governance Committee.

### f. Defendant Bisgaard

25. Defendant Peter Tuxen Bisgaard is a Company director since October 2017, Chair of its Nominating and Corporate Governance Committee, and a member of its Compensation Committee. Since September 2017, he is Managing Director of Nan Fung Life Sciences, a global life sciences investment platform, and a Managing Partner at Pivotal Bioventure Partners LLC ("Pivotal Bioventure"), a healthcare venture capital fund. From 2009 to September 2017, he was a Senior Partner at Novo Ventures, a healthcare-focused venture investment firm. He also currently serves on the board of Ceterix. Early in his career, he was a general consultant and a specialist within the Corporate Finance and Strategy Group at McKinsey & Co.

26. As of August 1, 2021, Bisgaard beneficially owns 2,934,805 shares of the Company's stock. According to the 2021 Proxy Statement, Defendant Bisgaard received total compensation of $133,113 for fiscal year 2020 including $13,125 for fees earned or paid in cash and $119, 988 in stock option awards.

### g. Defendant Seawell

27. Defendant A. Brooke Seawell ("Seawell") is a Company director since September 2020 and the Chair of its Audit Committee. Seawell joined NEA in 2005 as a Venture Partner, focusing on software, systems, and internet investments.

28. As of August 1, 2021, Seawell beneficially owns 10,230 shares of the Company's stock. According to the 2021 Proxy Statement, Defendant Seawell received total compensation of $184,035 for fiscal year 2020, including $15,000 for fees earned or paid in cash, and $169,035 in stock option awards.

7

### h.    Defendant Wu

29.    Defendant David Wu is a Company director since July 2014 and a member of its Audit Committee.  Since 2012, Wu is a Partner at Maveron LLC ("Maveron"), a venture capital firm, where his primary focus is emerging consumer Internet companies.  Wu led Maveron's investments in Eargo.

30.    As of August 1, 2021, Wu beneficially owns 1,558,490 shares of the Company's stock.  According to the 2021 Proxy Statement, he received total compensation of $129,988 for fiscal year 2020, including $10,000 for fees earned or paid in cash, and $119,988 in stock option awards.

## IV.    THE INDIVIDUAL DEFENDANTS' DUTIES

31.    By reason of their positions as officers or directors of Eargo and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed Eargo and its shareholders fiduciary obligations of loyalty, good faith, candor, and due care, and were and are required to use their utmost ability to control, manage and oversee Eargo in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Eargo and its shareholders to benefit all shareholders equally and not in furtherance of their personal interests or benefit.

32.    To discharge their duties, the officers and directors of Eargo were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial and corporate affairs and assets of the Company.  By virtue of such duties, the directors of Eargo were required to, among other things:[2]

- exercise their business judgment in good faith;
- act in what they reasonably believe to be the best interest of all stockholders;
- become and remain well-informed about the Company's business and operations and general business and economic trends affecting the Company; and

---

[2]    *See* Eargo's Corporate Governance Guidelines, https://ir.eargo.com/static-files/15291c32-b352-48a2-883d-0304984c98b7 (last accessed on November 17, 2021).

- ensure that the business of the Company is conducted to further the long-term interests of its stockholders.

## A.      Additional Duties Under The Code Of Business Conduct And Ethics

33.     Each Individual Defendant, as an Eargo director, had additional duties under the Company's Code of Business Conduct and Ethics (the "Code of Conduct").  Eargo's Code of Conduct "applies to all of our directors, officers, employees and consultants."[3]

34.     The Code of Conduct discusses the duty to report violations of the Code:

All employees, consultants and directors have a duty to report any known or suspected violation of this Code, including violations of the laws, rules, regulations, or policies that apply to the Company.  If you know of or believe there has been a violation of this Code, immediately report the conduct to your supervisor or the Compliance Officer.

35.     The Code of Conduct details the importance of protecting corporate assets:

**PROTECTION AND PROPER USE OF COMPANY ASSETS**

All employees, consultants and directors should protect the Company's assets and ensure their efficient use.  Theft, carelessness, and waste have a direct impact on the Company's financial results.  All Company assets should be used for legitimate business purposes.

36.     The Code of Conduct further states as follows regarding public disclosures:

**ACCURACY OF FINANCIAL REPORTS AND OTHER PUBLIC COMMUNICATIONS**

As a public company we are subject to various securities laws, regulations and reporting obligations.  Both federal law and our policies require the disclosure of accurate and complete information regarding the Company's business, financial condition and results of operations. Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage the Company and result in legal liability.

37.     The Code of Conduct further details the importance of complying with all laws and regulations applicable to the Company's business:

**COMPLIANCE WITH LAWS AND REGULATIONS**

Each employee, consultant and director has an obligation to comply with all laws, rules and regulations applicable to the Company's operations.  These include, without limitation, . . . insider trading, . . . ***false or misleading financial***

---

[3]      *See* https://ir.eargo.com/static-files/51fd1f5a-9ffc-402a-bedb-cf35308c0af3 (last accessed on Nov. 7, 2021).

***information or misuse of corporate assets.*** You are expected to understand and comply with all laws, rules and regulations that apply to your job position. If any doubt exists about whether a course of action is lawful, you should seek advice from your supervisor or the Compliance Officer.

**B.     Additional Duties Under The Audit Committee Charter**

38.     The Audit Committee Charter details the additional responsibilities of the members

of the Audit Committee which include, *inter alia*:

- **Form 10-K Review.** The Committee must review and discuss the annual audited financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

- **Audit Committee Report.** The Committee must provide the Company with the report of the Committee with respect to the audited financial statements for inclusion in each of the Company's annual proxy statements.

- **Form 10-Q Review.** The Committee must review and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

- **Review of Earnings Releases**. The Committee must discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.

- **Risk Assessment and Risk Management.** The Committee must discuss the Company's policies with respect to risk assessment and risk management.

- **Reports to the Board of Directors.** The Committee must report regularly to the Board regarding the activities of the Committee.

**C.     Additional Duties Under The Nominating And**
**        Corporate Governance Committee Charter**

39.     The Nominating and Corporate Governance Charter details the additional

responsibilities of the members of the Nominating and Corporate Governance Committee which

include, *inter alia*:

- **Corporate Governance Guidelines.** The Committee will develop and recommend to the Board the Corporate Governance Guidelines. The Committee will, from time to time as it deems appropriate, review, and reassess the adequacy of the Corporate Governance Guidelines and recommend any proposed changes to the Board for approval.

- **Reports to the Board of Directors.** The Committee must report regularly to the Board regarding the activities of the Committee.

1  **V.     SUBSTANTIVE ALLEGATIONS**

2          **A.     Background**

3          40.    Eargo is a medical device company whose hearing aids "are the first and only

4  virtually invisible, rechargeable, completely-in-canal, FDA-regulated, exempt Class I and Class II

5  devices for the treatment of hearing loss."[4]

6          41.    Eargo sells hearing devices directly to consumers. Its devices sync to the Eargo

7  app, where users can adjust their hearing preferences to obtain the optimal hearing experience in

8  each setting.[5]  Eargo is focused on increasing the number of people with hearing loss who use

9  hearing aids, by erasing the stigma, keeping costs down, and reducing the complexity of the

10 process of acquiring hearing aids.[6]

11         42.    The key to the success of Eargo's distinct business model is the Company's ability

12 to sell directly to the consumer without going through a lengthy approval process.  The direct-to-

13 consumer model promotes efficiency, provides customers with more direct support, and keeps the

14 costs of their products down, allowing Eargo to stand out from its competitors in the hearing aid

15 industry.[7]  Starting at a lower cost, Eargo can maximize the substantial benefit allowance from

16 third-party payors, such as federal insurance programs.  Eargo specifically targets federal

17 employees on its website, stating: "Are you a federal employee?  You may be eligible for Eargo

18 at no cost to you through the Federal Employees Health Benefits (FEHB) program."[8]

19

20 [4]        *See* https://ir.eargo.com/ (last visited on November 17, 2021).

21 [5]        *See* Mallory Hackett, https://www.mobihealthnews.com/news/eargo-goes-public-upsized-
22 ipo-worth-1413-million (last visited November 17, 2021) ("Hackett").

23 [6]        *See* https://www.youtube.com/watch?v=U9Ji4VwansI at 0:40.

24 [7]        S*ee* Chuck Martin (2019), https://www.stitcher.com/show/the-voices-of-the-internet-of-
   things-with-chuck-martin/episode/christian-gormsen-eargo-59212231 and accompanying audio
   at 18:00.

25 [8]        *See* https://www.eargo.com/federal (last visited November 17, 2021).  *See*
26 *also* Elizabeth Orr, https://medtech.pharmaintelligence.informa.com/MT144554/Hearing-Aid-
   Maker-Eargo-Target-Of-US-DOJ-Investigation (last visited November 17, 2021) ("Orr").

27

28                                             11

43.     In the Offering Materials, the Company stresses the advantages of its business model, stating:

> **Our business model and consumer journey**
>
> We employ a differentiated, consumer-first business model to empower the consumer and improve the accessibility and affordability of high-quality hearing aids. . .  Once a potential customer has expressed interest in our Eargo solution, one of our sales consultants will contact them directly.  ***In addition, Eargo provides insurance claims processing for customers, eliminating in most cases the need for customers to interface with their insurance providers.***[9]  Customers are able to complete their purchase over the phone with their sales consultant or directly on our website, without the need to navigate multiple visits to the hearing clinic for tests and fittings.  Once a customer makes their purchase, they are assigned to one of our licensed hearing professionals, who provides complimentary convenient clinical support by phone, chat or email.  ***The combination of these services allows us to deliver clinical support in an efficient and streamlined manner without the burden of in-clinic visits.***

44.     Eargo's initial public offering of shares was held on October 16, 2020, with an initial stock price of $18 per share.[10]  The stock closed on its first day of trading at $33.68 per share, or 87.1% above its IPO price.

### B.     The Substantial Risks Associated With Eargo's Business Model

45.     In the Offering Materials, which were signed by all but one of the Individual Defendants, the substantial risks associated with deviating from the traditional model in the hearing aid industry are acknowledged:

> ***We are deploying a new business model in an effort to disrupt a relatively mature industry.  In order to successfully challenge incumbent business models and become profitable, we will need to continue to refine our product and strategy.***
>
> ***Our direct-to-consumer business model is new to the hearing aid industry.***  Our products are currently primarily available direct-to-consumer and are therefore generally not sold by channels which consumers would traditionally look to for the treatment of their hearing loss.

*** 

---

[9]     Unless otherwise stated, all emphasis herein is added.

[10]     *See* Hackett.

Delivery of hearing aids via a direct-to-consumer model represents a change from the traditional channel, which requires in-person visits to one or more hearing care professionals. . . .

46.     The Offering Materials also acknowledge the material risk posed to the Company by needing to maintain third-party coverage for its products:

**Changes in third-party coverage and reimbursement may impact our ability to grow and sell our products.** [11]

Our products are primarily purchased on a cash-pay basis **and currently only have limited coverage by third-party payors.**  Third-party coverage and reimbursement may increase for certain hearing aids but not our products, or could decrease for our products, which could reduce our market share.  The process for determining whether a third-party payor will provide coverage for a product may be separate from the process for establishing the reimbursement rate that such a payor will pay for the product.  A payor's decision to provide coverage for a product does not imply that an adequate reimbursement rate will be approved.  Further, one payor's determination to provide coverage for a product does not assure that other payors will also provide such coverage.  **Third-party coverage and reimbursement may never become available to us at sufficient levels.**

47.     In the Offering Materials and in all the Company's subsequent quarterly and annual reports filed with the SEC, the Company disclosed the possible risks associated with regulatory actions, specifically regarding insurance coverage and reimbursement:

**We operate in a regulated industry and changes in regulation or the implementation of existing regulation could affect our operations.**

Our products and our business activities are subject to rigorous regulation in the jurisdictions in which we operate.  **In particular, these laws govern: (i) coverage and reimbursement by the national health services or by private health insurance services for the purchase of hearing aids**; (ii) the supply of hearing aids to the public and, more specifically, the training and qualifications required to practice the profession of hearing aid fitting specialist; and (iii) the development, testing, manufacturing, labeling, premarket clearance or approval and marketing, advertising, promotion, export and import of our hearing aids.  Accordingly, our

---

[11]     Emphasis in original. Similar language is contained in the Company's Quarterly Report on Form 10-Q filed with the SEC on November 20, 2020, for the period ended September 30, 2020 (the "3Q20 10-Q") and on its Annual Report on Form 10-K filed with the SEC on March 16, 2021, for the period ended December 31, 2020 (the "2020 10-K").  The 2020 10-K was signed by all of the Individual Defendants except Defendant Bayne and contained the signed certification of Gormsen, pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), verifying that the 2020 10-K fully complied with the requirements of section 13(a) or 15(d) of the Exchange Act and that the information contained in the 2020 10-K fairly presented, in all material respects, the financial condition and results of operations of the Company.

business may be affected by changes in any such laws and regulations and, in particular, by changes to the conditions for coverage, the way in which reimbursement is calculated, the ability to obtain national health insurance coverage or the role of the ear, nose and throat specialists.

\*\*\*

*If we fail to comply with U.S. or foreign federal and state healthcare regulatory laws, we could be subject to penalties, including, but not limited to, administrative, civil and criminal penalties, damages, fines, disgorgement, exclusion from participation in governmental healthcare programs and the curtailment of our operations, any of which could adversely impact our reputation and business operations.*

To the extent our products are or become covered by any federal or state government healthcare program, our operations and business practices may expose us to broadly applicable fraud and abuse and other healthcare laws and regulations. These laws may constrain the business or financial arrangements and relationships through which we conduct our operations, including our sales and marketing practices, consumer incentive and other promotional programs and other business practices.  Such laws include, without limitation:

- Health Insurance Portability and Accountability Act of 1996, or HIPAA, which imposes criminal and civil liability for, among other things, knowingly and willfully executing, or attempting to execute, a scheme to defraud any healthcare benefit program, or knowingly and willfully falsifying, concealing or covering up a material fact or making any materially false statement, in connection with the delivery of, or payment for, healthcare benefits, items or services.  Similar to the U.S. federal Anti-Kickback Statute, a person or entity does not need to have actual knowledge of the statute or specific intent to violate it in order to have committed a violation

\*\*\*

*It is possible that governmental authorities will conclude that our business practices do not comply with current or future statutes, regulations, agency guidance or case law involving applicable fraud and abuse or other healthcare laws and regulations*.  If our operations are found to be in violation of any of the laws described above or any other governmental laws and regulations that may apply to us, *we may be subject to significant penalties, including civil, criminal and administrative penalties, damages, fines, exclusion from government-funded healthcare programs*, such as state Medicaid programs, TRICARE or similar programs in other countries or jurisdictions, disgorgement, imprisonment, contractual damages, reputational harm, diminished profits and the curtailment or restructuring of our operations.  Further, defending against any such actions can be costly and time-consuming and may require significant personnel resources.  Even if we are successful in defending against any such actions that may be brought against us, our business may be impaired.

48.     Further, in the Offering Materials and in all the Company's subsequent quarterly and annual reports filed with the SEC, the Company disclosed a material weakness in its internal controls over financial reporting:

> ***We have identified a material weakness in our internal control over financial reporting. If our remediation of the material weakness is not effective, or if we experience additional material weaknesses in the future or otherwise fail to maintain an effective system of internal controls in the future, we may not be able to accurately or timely report our financial condition or results of operations, which may adversely affect investor confidence in us and, as a result, the value of our common stock.***

> Prior to the completion of this offering, we have been a private company with limited accounting personnel to adequately execute our accounting processes and other supervisory resources with which to address our internal control over financial reporting.  In connection with the preparation of our financial statements, we identified a material weakness in our internal control over financial reporting . . . ***The material weakness related to a lack of qualified supervisory accounting resources, including those necessary to account for and disclose certain complex transactions and for which we lacked the technical expertise to identify, analyze and appropriately record those transactions***.

> ***                                    ***

> We cannot assure you that the measures we have taken to date, and are continuing to implement, will be sufficient to remediate the material weakness we have identified or avoid potential future material weaknesses***. If the steps we take do not correct the material weakness in a timely manner, we will be unable to conclude that we maintain effective internal control over financial reporting***. Accordingly, there could continue to be a reasonable possibility that a material misstatement of our financial statements would not be prevented or detected on a timely basis.

> If we fail to remediate our existing material weakness or identify new material weaknesses in our internal controls over financial reporting, if we are unable to comply with the requirements of Section 404 of the Sarbanes-Oxley Act in a timely manner, if we are unable to conclude that our internal controls over financial reporting are effective, or if our independent registered public accounting firm is unable to express an opinion as to the effectiveness of our internal controls over financial reporting when we are no longer an emerging growth company, investors may lose confidence in the accuracy and completeness of our financial reports and the market price of our common stock could be negatively affected. ***As a result of such failures, we could also become subject to investigations by the stock exchange on which our securities are listed, the SEC, or other regulatory authorities, and become subject to litigation from investors and stockholders, which could harm our reputation and financial condition or divert financial and management resources from our regular business activities.***

49.    The Company also disclosed in the Offering Materials and subsequent SEC filings the risk associated with legal and arbitration proceedings, which could potentially harm the Company's financial condition and the results of its operations:

> ***We are subject to risks from legal and arbitration proceedings and that may prevent us from pursuing our business activities or require us to incur additional costs in defending against claims or paying damages.***
>
> We may become subject to legal disputes and regulatory proceedings in connection with our business activities involving, . . . alleged violations of applicable laws in various jurisdictions.  Although we maintain liability insurance in amounts we believe to be consistent with industry practice, we may not be fully insured against all potential damages that may arise out of any claims to which we may be party in the ordinary course of our business.
>
> The outcome of pending or potential future legal and arbitration proceedings is difficult to predict with certainty.  In the event of a negative outcome of any material legal or arbitration proceeding, whether based on a judgment or a settlement agreement, we could be obligated to make substantial payments, which could have a material adverse effect on our business, financial condition and results of operations.  In addition, the costs related to litigation and arbitration proceedings may be significant, and any legal or arbitration proceedings could have a material adverse effect on our business, financial condition and results of operations.
>
> ***
>
> In the past few years, stock markets have experienced extreme price and volume fluctuations.  In the past, following periods of volatility in the overall market and the market price of a company's securities, ***securities class action litigation has often been instituted against these companies.  Such litigation, if instituted against us, could result in substantial costs and a diversion of our management's attention and resources.***

## C.    Eargo Reports Growing Revenue

50.    On May 13, 2021, Eargo filed its Quarterly Report on Form 10-Q for the period ended March 31, 2021 (the "1Q21 10-Q").  The 1Q21 10-Q contained the signed certification of Gormsen, pursuant to SOX, verifying that the report fully complied with the requirements of section 13(a) or 15(d) of the Exchange Act and that the information contained in the report fairly presented, in all material respects, the financial condition and results of operations of the Company.

51.    In the 1Q21 10-Q, the Company disclosed its first-quarter financial results, including net revenues of $22.0 million, up 74.0% year-over-year, and gross systems shipped of

11,704, up 66.5% year-over-year.  The Company reported accounts receivable of nearly $5.4 million, up from the nearly $3.8 million balance reported in the 2020 10-K.

52.    The Company made brief mention of a "routine audit" with the Company's largest third-party payor:

> We currently submit claims on behalf of customers to a concentrated number of third-party payors under certain benefit plans.  Additionally, third-party payors periodically conduct pre- and post-payment reviews, including audits of previously submitted claims, and we are currently experiencing and may experience such reviews and audits of claims in the future.  ***For example, we are currently subject to a routine audit with our largest third-party payor, who accounted for approximately 57% of the Company's gross accounts receivable as of March 31, 2021.***  Such reviews and audits of our claims have resulted and could in the future result in significant delays in payment, and could result in material recoupments of previous claims paid or denials of pending or future claims, which could impact our ability to recognize revenue, reduce our net sales and profitability, or result in the loss of our ability to submit claims to certain third-party payors for payment.

53.    This audit by the Company's largest third-party payor was of particular concern since, as disclosed in the 1Q21 10-Q, the Company relies on a concentrated number of third-party payors for its revenues:

> ***Third-party payors***
>
> A significant portion of our revenue depends on payments ***from a concentrated number of third-party payors*** that we submit claims to on behalf of our customers.  We expect to continue to focus substantial resources on both securing existing third-party reimbursement and increasing coverage and reimbursement for our current products and any future products we may develop.  We are actively engaged in efforts to access the growing insurance coverage for hearing aids, including contracting or partnering with third-party payors, associations, and employers who offer hearing aid coverage to their members.  Increasing the number of health plans we have access to would allow us to serve more customers who have access to some financial help paying for hearing aids.
>
> ***
>
> A significant portion of our revenue is dependent upon reimbursement from third-party payors.  Any material changes to third-party coverage or reimbursement could significantly impact our business and our ability to grow and sell our products.

**D.    Eargo Is Investigated By The Department Of Justice**

54.    On August 12, 2021, Eargo filed with the SEC its Quarterly Report on Form 10-Q for the period ended June 30, 2021 (the "2Q21 10-Q").  The 2Q21 10-Q contained the signed certification of Gormsen, pursuant to SOX, verifying that the report fully complied with the

requirements of Section 13(a) or 15(d) of the Exchange Act and that the information contained in the report fairly presented, in all material respects, the financial condition and results of operations of the Company.

55.     In the 2Q21 10-Q, Eargo disclosed that, as the end of June 30, 2021, the third-party payor that was conducting the audit disclosed in the 1Q21 10-Q accounted for 80% of the Company's gross accounts receivable and that it had not been paid on claims submitted since March 31, 2021, because of the ongoing audit.  Eargo disclosed that its accounts receivable balance had swelled to $15,361,000.  Eargo further disclosed that reimbursement claims submitted to another insurance company are also undergoing an audit.

56.     The 2Q21 10-Q detailed the audits and their effect on the Company's business:

**Third-party payors**

**A significant portion of our revenue depends on payments from a concentrated number of third-party payors that we submit claims to on behalf of our customers.** … We are actively engaged in efforts to access the growing insurance coverage for hearing aids, including contracting or partnering with third-party payors, associations, and employers who offer hearing aid coverage to their members ….

As described in Note 2 of the Notes to Unaudited Consolidated Financial Statements included in this Quarterly Report on Form 10-Q, approximately 80% and 45% of our gross accounts receivable as of June 30, 2021 and December 31, 2020, respectively, were related to reimbursement claims submitted to an insurance company that is our largest third-party payor.  **The increase in gross accounts receivable as of June 30, 2021 was primarily due to a claims audit currently in process by such third-party payor, during which claims submitted since March 1, 2021 have not been paid.  Reimbursement claims submitted to another insurance company are also currently undergoing an audit,** and to date claims from this insurance company have been processed and approved consistent with normal business practices during the audit.  **In addition to the risk that the insurance companies may deny the claims subject to the current audits, and we have received some denials to date, it is possible that they may seek recoupments of previous claims paid and deny any future claims.**  While we believe the claims submitted are valid and reimbursable with these insurance companies, and there exist processes for appeal and, if necessary, corrective action, an unfavorable outcome of the ongoing audits could have a material adverse effect on our future financial results, including our revenue recognition, sales return rate and bad debt reserve.  **We are unable to provide assurances regarding the outcome of these audits.**  Please see the Risk Factor titled "A significant portion of our revenue is dependent upon reimbursement from third-party payors.  Any material changes to third-party coverage or reimbursement or adverse outcomes of third-party payor audits could significantly impact our business and our ability to grow and sell our products."

18

57.     In a conference call with financial analysts held the same day, Eargo CFO Adam Laponis ("Laponis") commented on the burgeoning accounts receivable balance:

> I'd now like to turn to the audit in process by our largest third-party payer referenced in today's press release.
>
> The payer accounted for approximately 80% of our gross accounts receivable as of June 30, 2021.  As a result of the audit, claims submitted to the payer since March 1, 2021, have not been paid, **increasing our net accounts receivable balance to approximately $15.4 million as of June 30, 2021.  Approximately $10 million or roughly half of our total cash from this quarter is due to the claims that had not been processed**.[12]

58.     When questioned by an analyst from Bank of America Merrill Lynch, Laponis reassured investors that the audits were common and that the Company expected a "positive outcome":

> Yes.  And, Bob, look, these kind of audits and claims are pretty common, particularly given the growth in our business.  We believe all the claims we submitted are valid reimbursable, and we have had a very productive call even this week with the payer, and we're confident we're able to provide them all the requested documentation.  Of course, I can't speculate on to where the claims will -- whether they will absolutely be processed or not.
>
> But ultimately, our expectation and guidance is based on a positive outcome and we'll keep everybody posted as we learn more.

59.     In response to a question as to why the insurance company performing the audit was not paying claims, Gormsen responded that the audits were an "educational process" where the federal insurance programs were learning about Eargo's unique business model:

> **So this is more, as I see it, an education of our business model and how our business model works differently from the classic way of distributing hearing aids.**  Given that we're in an active discussion and it's a very constructive discussion, we're not disclosing the name, **but it is a large payer that's basically administrating on behalf of the federal government.**  So I think you probably know what I'm talking about on that front.  So it's really -- right now, it's a discussion around -- and of course, what they're seeing is -- remember, other people basically claiming benefits are typically independent providers.
>
> So it's a lot of very small and a low number of volume we're providing all over America, right?  So we're one single provider with a high volume and hence a lot of dollars flowing through.  So we see this more as -- **they're actually doing their**

---

[12]     *See* THE MOTLEY FOOL, https://www.fool.com/earnings/call-transcripts/2021/08/12/eargo-inc-ear-q2-2021-earnings-call-transcript/ (last visited Nov. 17, 2021).

*diligence by auditing everything we do because we do it in a different way than it's been --* we don't do it through a clinic, right? We do it through telecare, online experiences, and phone experiences. *So it's really this process of seeing how that fits into the sort of the traditional way of providing documentation and so on for benefits. So that's the discussion.*

You asked about '21. Again, we can't speculate on what the timing is going to be, but that's clearly what we see an opportunity for. *And we see this more as an educational process that gives us the opportunity to further broaden our insurance coverage.*

60.     On the news of the audits and their effect on the Company's financial condition, Eargo stock fell $8.00, or over 24%, to close at $24.70 per share, on unusually heavy trading volume.

61.     A little over a month later, on September 22, 2021, Eargo filed a Current Report on Form 8-K filed with the SEC in which the Company disclosed that it is the subject of an ongoing criminal investigation by the DOJ related to the insurance reimbursement claims the Company submitted on behalf of its customers covered by federal employee health plans, and that the DOJ is directly overseeing the audit by Eargo's largest third-party payor:

On September 21, 2021, Eargo, Inc. (the "Company") was informed that it is the target of a criminal investigation by the U.S. Department of Justice (the "DOJ") related to insurance reimbursement claims the Company has submitted on behalf of its customers covered by federal employee health plans. The Company is cooperating with the investigation. In addition, the Company intends to work with the government with the objective of validating the process to support any future claims that the Company may submit for reimbursement.

As previously disclosed, the Company has been the subject of an ongoing claims audit by an insurance company that is the Company's largest third-party payor. *The Company has been informed by the insurance company that the DOJ is now the principal contact related to the subject matter of the audit.*

*In light of this information, the Company is withdrawing its financial guidance for the fiscal year ending December 31, 2021.*

62.     On September 29, John Leppard from Washington Analysis LLC reported that Eargo's direct-to-consumer approach raised concerns with the DOJ because health insurance claims usually include ICD-10 coding based on a diagnosis documented by the patient's health care provider, a critical step with which Eargo dispensed.[13] Leppard noted further that the Health

---

[13]     *See* Orr.

Insurance Portability and Accountability Act ("HIPAA") states that any effort to "knowingly and willfully" misrepresent the conditions of health care delivery constitutes a fraudulent offense, and that Eargo's actions could be considered misrepresentation under FEHB policies.[14]  Eargo "both provides and submits – via electronic transmission under HIPAA – formal diagnoses, despite acknowledging that its online hearing test '***is not a hearing evaluation performed by an audiologist***'[15] and that its 'devices are available directly to consumers ***without the medical evaluation of a licensed practitioner***.'"[16]

63.     On October 4, the Company's stock hit another record low, trading at $6.32 per share, a 4% decrease from the previous close.  The Company's stock has fallen over 86% this year.

64.     On October 6, 2021, a securities class action lawsuit was filed against the Company, Gormsen, and Laponis, captioned *Fazio v. Eargo Inc., et al.*, No. 3:21-cv-07848-YGR (N.D. Cal.) (the "*Fazio* Action"), seeking damages on behalf of persons and entities that purchased or otherwise acquired Eargo securities between February 25 and September 22, 2021, inclusive.

65.     On November 4, 2021, another securities class action lawsuit was filed against the Company, Gormsen, and Laponis, captioned *Chung v. Eargo Inc., et al.,* No. 3:21-cv-08597-CRB (N.D. Cal.) (the "*Chung* Action"), seeking damages on behalf of persons and entities that purchased or otherwise acquired Eargo securities between February 25 and September 22, 2021, inclusive.

66.     On November 15, 2021, a securities class action lawsuit was filed against the Company, Laponis, Defendants Gormsen, Makower, Bisgaard, Hughes, Richardson, Seawell, and Wu, former directors Juliet Bakker and Geoff Pardo, and IPO underwriters J.P. Morgan Securities LLC, BofA Securities, Inc., Wells Fargo Securities, LLC, and William Blair & Company, L.L.C.,

---

[14]     *Id*.  *See also* Pub. L. 104–191 Sec. 1347 https://www.govinfo.gov/content/pkg/PLAW-104publ191/html/PLAW-104publ191.htm (last visited on Nov. 17, 2021).

[15]     *See* https://www.eargo.com/faq (last visited Nov. 17, 2021).

[16]     *See* Orr; the Prospectus p. 40.

captioned *IBEW Local 353 Pension Plan v. Eargo Inc., et al.,* No. 3:21-cv-08747 (N.D. Cal. November 15, 2021) (the "*IBEW* Action" and collectively with the *Fazio* Action and *Chung* Action, the "Securities Class Actions") seeking damages of on behalf of all persons or entities that purchased or otherwise acquired: (a) Eargo shares in or traceable to the Company's IPO and/or (b) shares of Eargo common stock between October 15, 2020 and September 22, 2021, inclusive.

67.     The Securities Class Actions were filed against Eargo in the wake of the substantial stock price drops after the disclosure of the DOJ investigation of the Company and third-party payor audits.  The *Fazio* and *Chung* Actions seek damages alleging violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and Section 20 (a) of the Exchange Act.  The *Fazio* and *Chung* Actions allege that the defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects, relating to the Company's submission of improper insurance claims to federal programs, resulting in deleterious effects on the financials of the Company and subjecting Eargo to intense regulatory scrutiny and investigation.

68.     The *IBEW* Action seeks damages, alleging violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, Section 20 (a) of the Exchange Act, and Sections 11, 12(a)(2) and 15 of the Securities Act of 1933.  The *IBEW* Action alleges that the named defendants made materially false and/or misleading statements in the Offering Materials and during the detailed class period concerning the extent of available insurance coverage for Eargo's products and how that coverage purportedly drove the Company's earnings and growth.

69.     On November 16, 2021, Eargo filed with the SEC a Form 12b-25 notification of its inability to timely file its Quarterly Report on Form 10-Q for the period ended September 30, 2021 (the "Form 12b-25").  In the Form 12b-25, the Company disclosed further details regarding the DOJ investigation:

> As previously disclosed, on September 21, 2021, the Company was informed that it is the target of an ongoing criminal investigation by the U.S. Department of Justice (the "DOJ") related to insurance reimbursement claims the Company submitted on behalf of its customers covered by various federal employee health

plans under the Federal Employee Health Benefits ("FEHB") program.  Total payments the Company has received to date from the government in relation to claims submitted under the FEHB program, net of any product returns and associated refunds, are approximately $44 million.  The investigation also pertains to the Company's role in customer reimbursement claim submissions to federal employee health plans.

70.     The Company further disclosed that it was the subject of two new audits of its insurance claim process:

Two additional third-party payor audits related to claims submitted for customers with FEHB plans are also in process.  During the three months ended September 30, 2021, the Company shipped 13,117 gross hearing aid systems, approximately 48% of which were to customers with potential insurance coverage.

The Company has not yet completed its assessment of the accounting impact of the DOJ investigation and the ongoing claims audits on its financial statements for the three months ended September 30, 2021 and prior periods, and is therefore unable to file the Form 10-Q on a timely basis.

### E.     Eargo's False And Misleading Proxy Statement

71.     Eargo's 2021 Proxy Statement solicited stockholders to, among other things, elect Defendants Gormsen, Hughes, and Wu to the Eargo Board.  The 2021 Proxy Statement was issued by order of the Board and was signed by Defendant Gormsen.

72.     The 2021 Proxy Statement contains the following statement regarding the Board's commitment to strong corporate governance guidelines:

**Corporate Governance Guidelines**

***We believe in sound corporate governance practices and have adopted formal Corporate Governance Guidelines to enhance our effectiveness***.  Our Board adopted these Corporate Governance Guidelines in order to ensure that it has the necessary practices in place to review and evaluate our business operations as needed and to make decisions that are independent of our management.  ***The Corporate Governance Guidelines are also intended to align the interests of directors with those of our stockholders.***

73.     The 2021 Proxy Statement represents that the Board oversees and monitors the Company's risk exposures:

**Role of Board in Risk Oversight Process**

Risk assessment and oversight are an integral part of our governance and management processes.  Our Board encourages management to promote a culture that incorporates risk management into our corporate strategy and day-to-day business operations. ... Throughout the year, ***senior management reviews these***

23

***risks with the Board at regular board meetings*** as part of management presentations that focus on particular business functions, operations or strategies, and presents the steps taken by management to mitigate or eliminate such risks.

Our Board does not have a standing risk management committee, ***but rather administers this oversight function directly through our Board as a whole***, as well as through various standing committees of our Board that address risks inherent in their respective areas of oversight. ***While our Board is responsible for monitoring and assessing strategic risk exposure,*** our Audit Committee is responsible for overseeing our major financial risk exposures and the steps our management has taken to monitor and control these exposures.

74.     The foregoing statements in the 2021 Proxy Statement were false and misleading and omitted material information.  Contrary to the representations made in the Proxy, the Board: (1) failed to implement and maintain an effective system of internal controls designed to ensure the Company's compliance with laws, rules, and regulations governing Eargo's core operations; (2) failed to implement and maintain an effective system of internal controls over financial reporting and public statements made by the Company's officers; (3) failed to implement and maintain effective internal controls and corporate governance practices and procedures to effectively oversee the material risks posed to the Company; and (4) failed to investigate and take action when presented with red flags that the internal controls over the Company's insurance claim process and financial reporting were inadequate.

75.     The wrongful conduct alleged herein has damaged Eargo, causing the Company to be subject of ongoing audits by certain federal third-party payors, an investigation by the DOJ, the Securities Class Actions, and irreparably harming its reputation.

## VI.     DEMAND FUTILITY AND DERIVATIVE ALLEGATIONS

76.     Plaintiff brings this action derivatively for the benefit of Eargo to redress injuries suffered, and to be suffered, because of the Individual Defendants' breaches of their fiduciary duties, waste of corporate assets, and violation of Sections 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

77.     Eargo is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

78.     Plaintiff is and has been at all relevant times, a shareholder of Eargo.  Plaintiff adequately and fairly represents the interests of Eargo in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to prosecute this action.

79.     The Board is neither disinterested nor independent.  Demand upon the Board to institute this action against the Individual Defendants would be futile and is, thus, excused.

**A.     Demand Upon Defendant Gormsen Is Excused**

80.     Defendant Gormsen currently serves as the Company's President and CEO and has served as a director for close to seven years.  Thus, as the Company admits in its Proxy filings, he is not an independent director.  The Company provides Defendant Gormsen with his principal occupation from which he receives substantial compensation, including $3,811,736 during fiscal year 2020 alone.

81.     Gormsen signed the 2021 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

82.     Gormsen benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Eargo Board through the false and misleading statements and material omissions in the 2021 Proxy Statement.

83.     Gormsen will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments.  Gormsen holds 1,206,386 Eargo shares.  If Gormsen acknowledged that he, Eargo, or others engaged in misconduct, his investment in Eargo would be substantially devalued.  Further, if Gormsen acknowledged that executives at Eargo had engaged in the wrongdoing alleged, he would be acknowledging that he, as the CEO of the Company, either knew of the wrongdoing or should have known of the wrongdoing.

84.     As a named defendant in the Securities Class Actions, Gormsen is incapable of impartially considering a demand to commence and vigorously prosecute this action.

85.     Moreover, Gormsen, as a director of Eargo, was required to, but failed: (1) to implement and maintain an effective system of internal controls designed to ensure the Company's compliance with laws, rules, and regulations governing Eargo's core operations; (2) to implement and maintain an effective system of internal controls over financial reporting and public statements made by the Company's officers; (3) to implement and maintain effective internal controls and corporate governance practices and procedures to effectively oversee the material risks posed to the Company; and (4) to investigate and take action when presented with red flags that the internal controls over the Company's insurance claim process and financial reporting were inadequate.

86.     Gormsen was required to investigate and take action to prevent damage to Eargo, its shareholders, and customers, but failed to take timely action, ignoring all the red flags, including an ongoing material weakness in the internal controls over financial reporting and a growing accounts receivable balance.  Had Gormsen taken timely action, the damage caused to Eargo could have been prevented or minimized.

87.     Defendants Gormsen and Bisgaard have long-standing business relationships which preclude them from acting independently and in the shareholders' and Company's best interests.  Gormsen and Bisgaard have known each other for many years, having worked closely with one another early in their careers as consultants in the Corporate Finance and Strategy Practice at McKinsey and Company.  Gormsen was brought to Eargo by Danish pharmaceutical giant Novo Nordisk in 2014 who was looking to invest in the fledgling startup through Novo Ventures, their venture capital arm.[17]  Furthermore, Bisgaard joined Eargo in October of 2017 shortly after helping lead a round of investment of 45 million dollars in Eargo as the managing director of Nan Fung Life Sciences.[18]

---

[17]     Novo Ventures did not invest in the Company at the time, but it did invest heavily in Eargo in 2017 when Bisgaard joined Eargo.

[18]     *See* https://www.prnewswire.com/news-releases/eargo-raises-up-to-45-million-in-series-c-funding-300540059.html (last accessed on Nov. 17, 2021).

88.     Gormsen is not independent and faces a substantial likelihood of liability for his breaches of fiduciary duty and violations of Federal securities laws.  Any demand upon Defendant Gormsen is futile and, thus, excused.

**B.     Demand Upon Defendant Makower Is Excused**

89.     Makower will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments.  Makower holds 6,619 Eargo shares.  Defendant Makower has served as an Eargo director for close to seven years and receives substantial compensation in the form of fees, stock awards, and other compensation based on his service as a director, including $143,738 during fiscal year 2020 alone.  If Makower acknowledged that he, Eargo, or others engaged in misconduct, his investment in Eargo would be substantially devalued and his lucrative position jeopardized.

90.     Makower authorized the 2021 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

91.     Makower serves as a Special Partner at NEA, a venture capital firm.  Along with Maveron, NEA led a Series B round of investment of $25 million in Eargo in 2015.  NEA beneficially owns, as of August 1, 2021, 4,520,670 Eargo shares, with voting control over approximately 11.55% of all outstanding Eargo common stock.[19]  NEA designated Makower to serve on the Board of Eargo.  Shortly after this round of investing, thousands of Eargo customers returned their hearing aids due to fundamental flaws in its design.[20]  Regardless, Maveron and NEA continued backing Eargo,[21] placing their professional reputations on the line.  If Makower

---

[19]     The information reflects the holdings of NEA as of August 1, 2021. *See* the 2021 Proxy Statement, p. 26.

[20]     *See* Lawrence Ingrassia, BILLION DOLLAR BRAND CLUB (2020), pp. 97-99.

[21]     Gormsen convinced the group of investors, including Maveron and NEA, to put at least another $20 million into the Company to turn things around.  *See* Geoff Pardo (2021) https://medtechconference.com/media/medtech-talk-podcast/now-hear-this-christian-gormsen-on-breaking-convention-in-the-hearing-industry-at-eargo and accompanying audio at 33:00-33:30 (last accessed Nov. 17, 2021).

acknowledged that he, Eargo, or the Individual Defendants engaged in misconduct, it would undermine Makower and NEA's credibility and weaken their ability to attract future business.

92.     As a named defendant in the *IBEW* Action, Makower is incapable of impartially considering a demand to commence and vigorously prosecute this action.

93.     Defendant Makower has long-standing business relationships with several of the other directors which precludes them from acting independently and in the shareholders' and Company's best interests.  For example, Makower and Seawell work together at NEA, with Makower serving as a Special Partner on the healthcare team and leading its medtech/healthtech practice over the last five years and Seawell acting as an advisor to NEA as a Venture Partner. Makower is the founder and Executive Chairman of ExploraMed, a medical device incubator. Defendant Richardson serves on the Board of ExploraMed.  Further, one of the companies created by the partnership between ExploraMed and NEA is Neotract, where Defendant Hughes was the CFO for seven years.  Defendants Makower and Bisgaard also both currently sit on the Board of Ceterix.

94.     Moreover, Makower, as a director of Eargo, was required to, but failed: (1) to implement and maintain an effective system of internal controls designed to ensure the Company's compliance with laws, rules, and regulations governing Eargo's core operations; (2) to implement and maintain an effective system of internal controls over financial reporting and public statements made by the Company's officers; (3) to implement and maintain effective internal controls and corporate governance practices and procedures to effectively oversee the material risks posed to the Company; and (4) to investigate and take action when presented with red flags that the internal controls over the Company's insurance claim process and financial reporting were inadequate.

95.     Makower was required to investigate and take action to prevent damage to Eargo, its shareholders, and customers, but failed to take timely action, ignoring all the red flags, including an ongoing material weakness in the internal controls over financial reporting and a growing

accounts receivable balance.  Had Makower taken timely action, the damage caused to Eargo could have been prevented or minimized.

96.     Moreover, as a member the Audit Committee, Makower had duties regarding oversight of the risks facing the Company and Eargo's compliance with relevant laws, rules, and regulations.  Makower utterly failed to perform these essential duties.

97.     Makower failed to uphold his additional obligations as a member of the Nominating and Corporate Governance Committee, which include, *inter alia*, ensuring the implementation and effectiveness of Eargo's Corporate Governance Guidelines.

98.     Makower is not independent and faces a substantial likelihood of liability for his breaches of fiduciary duty and violations of federal securities laws.  Any demand upon Defendant Makower is futile and, thus, excused.

**C.     Demand Upon Defendant Hughes Is Excused**

99.     Hughes will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments.  Hughes holds 45,545 Eargo shares.  Defendant Hughes receives substantial compensation in the form of fees, stock awards, and other compensation based on his service as a director, including $181,535 during fiscal year 2020.  If Hughes acknowledged that he, Eargo, or others engaged in misconduct, his investment in Eargo would be substantially devalued and his lucrative position jeopardized.

100.    Hughes also authorized the 2021 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

101.    Hughes benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Eargo Board through the false and misleading statements and material omissions in the 2021 Proxy Statement.

102.    As a named defendant in the *IBEW* Action, Hughes is incapable of impartially considering a demand to commence and vigorously prosecute this Action.

29

103.    Defendant Hughes and several of the directors have long-standing business relationships which precludes them from acting independently and in the shareholders' and Company's best interests.  Defendant Hughes was the CFO of Neotract for seven years.  Makower is the founder and Executive Chairman of ExploraMed, the incubator that created Neotract, and serves as a Special Partner at NEA, which supported ExploraMed in this effort.  Richardson serves on the Board of ExploraMed and Seawell serves as an advisor to NEA as a Venture Partner.  NEA also designated Hughes to serve on the Board of Eargo.

104.    Moreover, Hughes, as a director of Eargo, was required to, but failed: (1) to implement and maintain an effective system of internal controls designed to ensure the Company's compliance with laws, rules, and regulations governing Eargo's core operations; (2) to implement and maintain an effective system of internal controls over financial reporting and public statements made by the Company's officers; (3) to implement and maintain effective internal controls and corporate governance practices and procedures to effectively oversee the material risks posed to the Company; and (4) to investigate and take action when presented with red flags that the internal controls over the Company's insurance claim process and financial reporting were inadequate.

105.    Hughes was required to investigate and take action to prevent damage to Eargo, its shareholders, and customers, but failed to take timely action, ignoring all the red flags, including an ongoing material weakness in the internal controls over financial reporting and a growing accounts receivable balance.  Had Hughes taken timely action, the damage caused to Eargo could have been prevented or minimized.

106.    As a member the Audit Committee, Hughes had duties regarding oversight of the risks facing the Company and Eargo's compliance with relevant laws, rules, and regulations.  Hughes utterly failed to perform these essential duties.

107.    Hughes is not independent and faces a substantial likelihood of liability for his breaches of fiduciary duty and violations of Federal securities laws.  Any demand upon Defendant Hughes is futile and, thus, excused.

1

### D.    Demand Upon Defendant Richardson Is Excused

2        108.    Richardson will not sue those responsible for the wrongdoing pled herein because

3    doing so would harm her and her investments.  Richardson holds 47,554 of the Company's shares.

4    Defendant Richardson receives substantial compensation in the form of fees, stock awards, and

5    other compensation based on her service as a director, including $180,910 during fiscal year 2020.

6    If Richardson acknowledged that she, Eargo, or others engaged in misconduct, her investment in

7    Eargo would be substantially devalued and her lucrative position jeopardized.

8        109.    Richardson authorized the 2021 Proxy Statement containing false and misleading

9    statements and material omissions and faces a substantial likelihood of liability therefor.

10       110.    As a named defendant in the *IBEW* Action, Richardson is incapable of impartially

11   considering a demand to commence and vigorously prosecute this Action.

12       111.    Defendant Richardson and several of the other directors have long-standing

13   business relationships which precludes them from acting independently and in the shareholders'

14   and Company's best interests.  Richardson serves on the board of ExploraMed.  Makower is the

15   founder and Executive Chairman of ExploraMed and acts as a Special Partner at NEA, which

16   works closely with ExploraMed to create new companies.  Seawell serves as an advisor to NEA

17   as a Venture Partner and Hughes was the CFO at Neotract, a company created through the

18   collaboration of ExploraMed and NEA.

19       112.    Moreover, Richardson, as a director of Eargo, was required to, but failed: (1) to

20   implement and maintain an effective system of internal controls designed to ensure the Company's

21   compliance with laws, rules, and regulations governing Eargo's core operations; (2) to implement

22   and maintain an effective system of internal controls over financial reporting and public statements

23   made by the Company's officers; (3) to implement and maintain effective internal controls and

24   corporate governance practices and procedures to effectively oversee the material risks posed to

25   the Company; and (4) to investigate and take action when presented with red flags that the internal

26   controls over the Company's insurance claim process and financial reporting were inadequate.

27

28

113.     Richardson was required to investigate and take action to prevent damage to Eargo, its shareholders, and customers, but failed to take timely action, ignoring all the red flags, including an ongoing material weakness in the internal controls over financial reporting and a growing accounts receivable balance.  Had Richardson taken timely action, the damage caused to Eargo could have been prevented or minimized.

114.     Richardson is not independent and faces a substantial likelihood of liability for her breaches of fiduciary duty and violations of federal securities laws.  Any demand upon Defendant Richardson is futile and, thus, excused.

**E.     Demand Upon Defendant Bayne Is Excused**

115.     Defendant Bayne authorized the 2021 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

116.     Bayne, as a director of Eargo, was required to, but failed: (1) to implement and maintain an effective system of internal controls designed to ensure the Company's compliance with laws, rules, and regulations governing Eargo's core operations; (2) to implement and maintain an effective system of internal controls over financial reporting and public statements made by the Company's officers; (3) to implement and maintain effective internal controls and corporate governance practices and procedures to effectively oversee the material risks posed to the Company; and (4) to investigate and take action when presented with red flags that the internal controls over the Company's insurance claim process and financial reporting were inadequate.

117.     Bayne was required to investigate and take action to prevent damage to Eargo, its shareholders, and customers, but failed to take timely action, ignoring all the red flags, including an ongoing material weakness in the internal controls over financial reporting and a growing accounts receivable balance.  Had Bayne taken timely action the damage caused to Eargo could have been prevented or minimized.

118.     Moreover, Bayne failed to uphold her additional obligations as a member of the Nominating and Corporate Governance Committee, which include, *inter alia*, ensuring the implementation and effectiveness of Eargo's Corporate Governance Guidelines.

119.     Bayne is not independent and faces a substantial likelihood of liability for her breaches of fiduciary duty and violations of federal securities laws.  Any demand upon Defendant Bayne is futile and, thus, excused.

**F.     Demand Upon Defendant Bisgaard Is Excused**

120.     Bisgaard will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments.  Bisgaard holds 2,934,805 Eargo shares.  Defendant Bisgaard has served as an Eargo director for four years and received substantial compensation in the form of fees, stock awards, and other compensation based on his service as a director, including $133,113 during fiscal year 2020 alone.  If Bisgaard acknowledged that he, Eargo, or others engaged in misconduct, his investment in Eargo would be substantially devalued and his lucrative position jeopardized.

121.     Bisgaard authorized the 2021 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

122.     As a named defendant in the *IBEW* Action, Bisgaard is incapable of impartially considering a demand to commence and vigorously prosecute this Action.

123.     Furthermore, since September 2017, Bisgaard has been Managing Director of Nan Fung Life Sciences, and a Managing Partner at Pivotal Bioventure.  According to the 2021 Proxy Statement, as of August 1, 2021, Bisgaard holds the voting control over 2,886,724 Eargo shares, representing approximately 7.37% of all outstanding Eargo common stock, through his positions with Nan Fung Life Sciences and Pivotal Bioventure.[22]  If Bisgaard acknowledged that he, Eargo, or others engaged in misconduct, Nan Fung Life Science's investment in Eargo would be substantially devalued and his lucrative position jeopardized.

---

[22]     *See* p. 27 n. 10.

124.    Moreover, Defendant Bisgaard has long-standing business relationships with other directors that preclude them from acting independently and in the shareholders' and the Company's best interests.  Gormsen and Bisgaard have known each other for many years, having worked closely with one another early in their careers as consultants in the Corporate Finance and Strategy Practice at McKinsey and Company.  Gormsen was introduced to Eargo through Danish pharmaceutical giant Novo Nordisk in 2014 who was looking to invest in the fledgling startup through Novo Ventures, their venture capital arm.[23]  Bisgaard joined Eargo in October 2017 shortly after helping lead a round of investment of 45 million dollars in Eargo, as the managing director of Nan Fung Life Sciences.  Makower and Bisgaard also both currently sit on the Board of Ceterix.

125.    Bisgaard as a director of Eargo, was required to, but failed: (1) to implement and maintain an effective system of internal controls designed to ensure the Company's compliance with laws, rules, and regulations governing Eargo's core operations; (2) to implement and maintain an effective system of internal controls over financial reporting and public statements made by the Company's officers; (3) to implement and maintain effective internal controls and corporate governance practices and procedures to effectively oversee the material risks posed to the Company; and (4) to investigate and take action when presented with red flags that the internal controls over the Company's insurance claim process and financial reporting were inadequate.

126.    Bisgaard was required to investigate and take action to prevent damage to Eargo, its shareholders, and customers, but failed to take timely action, ignoring all the red flags, including an ongoing material weakness in the internal controls over financial reporting and a growing accounts receivable balance.  Had Bisgaard taken timely action, the damage caused to Eargo could have been prevented or minimized.

---

[23]    Novo Ventures did not invest in the Company at the time, but it did invest heavily in Eargo in 2017 when Bisgaard joined Eargo.

127.    Bisgaard failed to uphold his additional obligations as Chair of the Nominating and Corporate Governance Committee, which include, *inter alia*, ensuring the implementation and effectiveness of Eargo's Corporate Governance Guidelines.

128.    Hence, Bisgaard is not independent and faces a substantial likelihood of liability for his breaches of fiduciary duty and violations of Federal securities laws.  Any demand upon Defendant Bisgaard is futile and, thus, excused.

**G.    Demand Upon Defendant Seawell Is Excused**

129.    Seawell will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments.  Seawell holds 10,230 Eargo shares.  Defendant Seawell receives substantial compensation in the form of fees, stock awards, and other compensation based on his service as a director, including $184,035 during fiscal year 2020.  If Seawell acknowledged that he, Eargo, or others engaged in misconduct, his investment in Eargo would be substantially devalued and his lucrative position jeopardized.

130.    Seawell authorized the 2021 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

131.    As a named defendant in the *IBEW* Action, Seawell is incapable of impartially considering a demand to commence and vigorously prosecute this Action.

132.    Seawell also serves as a Venture Partner at NEA, a venture capital firm that, beneficially owns 4,520,670 Eargo shares with voting control over approximately 11.55% of all outstanding Eargo common stock.[24]  Along with Maveron, NEA led a Series B round of investment of $25 million in Eargo in 2015.  Shortly after this round of investing, thousands of Eargo customers returned their hearing aids due to fundamental flaws in its design.[25]  Regardless, Maveron and NEA continued backing Eargo,[26] placing their professional reputations on the line.

---

[24]    The information reflects the holdings of NEA as of August 1, 2021.  *See* the 2021 Proxy Statement, p. 26.

[25]    *See* Lawrence Ingrassia, BILLION DOLLAR BRAND CLUB (2020), pp. 97-99.

[26]    Gormsen convinced the group of investors, including Maveron and NEA, to put at least

If Seawell acknowledged that he, Eargo, or others engaged in misconduct, it would undermine Seawell and NEA's credibility and weaken their ability to attract future business.

133.    Defendant Seawell and several other directors have long-standing business relationships which precludes them from acting independently and in the shareholders' and Company's best interests.  Makower and Seawell work closely together at NEA, with Makower serving as a Special Partner on the healthcare team and leading its medtech/healthtech practice over the last five years and Seawell acting as an advisor to NEA as a Venture Partner.  Makower founded ExploraMed, which collaborates closely with NEA, and serves as its Executive Chairman. Richardson serves on the Board of ExploraMed and Hughes was CFO at Neotract, a company created through the collaboration of ExploraMed and NEA.

134.    Seawell, as a director of Eargo, was required to, but failed: (1) to implement and maintain an effective system of internal controls designed to ensure the Company's compliance with laws, rules, and regulations governing Eargo's core operations; (2) to implement and maintain an effective system of internal controls over financial reporting and public statements made by the Company's officers; (3) to implement and maintain effective internal controls and corporate governance practices and procedures to effectively oversee the material risks posed to the Company; and (4) to investigate and take action when presented with red flags that the internal controls over the Company's insurance claim process and financial reporting were inadequate.

135.    Seawell was required to investigate and take action to prevent damage to Eargo, its shareholders, and customers, but failed to take timely action, ignoring all the red flags, including an ongoing material weakness in the internal controls over financial reporting and a growing accounts receivable balance.  Had Seawell taken timely action, the damage caused to Eargo could have been prevented or minimized.

---

another $20 million into the Company to turn things around. *See* Geoff Pardo (2021) https://medtechconference.com/media/medtech-talk-podcast/now-hear-this-christian-gormsen-on-breaking-convention-in-the-hearing-industry-at-eargo and accompanying audio at 33:00-33:30 (last accessed Nov. 17, 2021).

136.    As Chair of the Audit Committee, Seawell had duties regarding oversight of the risks facing the Company and Eargo's compliance with relevant laws, rules, and regulations. Seawell utterly failed to perform these essential duties.

137.    Seawell is not independent and faces a substantial likelihood of liability for his breaches of fiduciary duty and violations of federal securities laws.  Any demand upon Defendant Seawell is futile and, thus, excused.

**H.    Demand Upon Defendant Wu Is Excused**

138.    Wu will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments.  Wu holds 1,558,490 Eargo shares.  Defendant Wu has served as a Eargo director for more than seven years and receives substantial compensation in the form of fees, stock awards, and other compensation based on his service as a director, including $129,988 during fiscal year 2020 alone.  If Wu acknowledged that he, Eargo, or others engaged in misconduct, his investment in Eargo would be substantially devalued and his lucrative position jeopardized.

139.    Wu authorized the 2021 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

140.    As a named defendant in the *IBEW* Action, Wu is incapable of impartially considering a demand to commence and vigorously prosecute this Action.

141.    Wu benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Eargo Board through the false and misleading statements and material omissions in the 2021 Proxy Statement.

142.    Wu also serves as a Partner at Maveron, a venture capital firm that, beneficially owns 1,558,490 Eargo shares, with voting control over approximately 3.98% of the outstanding Eargo common stock.[27]  Maveron began investing in Eargo in 2013 and led an initial $2.6 million

---

[27]    The information reflects the holdings of Maveron as of August 1, 2021.  While the shares are under Defendant Wu's name, the shares are contractually assigned to Maveron and its affiliates.  *See* the 2021 Proxy Statement p. 27 n. 14.

seed investment round.  Wu led the initial investment of Maveron in Eargo.[28]  Maveron had only

invested in one other medical device start-up at the time but invested in Eargo despite other venture

capital firms' hesitancy.[29]  In June 2015, Eargo secured $13.6 million in new venture capital

financing in another investment round led by Maveron.[30]  A few months later, Maveron joined

with NEA and other investors to invest another 25 million into Eargo.  Shortly after this round of

investing, thousands of Eargo customers returned their hearing aids due to fundamental flaws in

its design.[31]  Regardless, Maveron and NEA continued backing Eargo,[32] placing their professional

reputations on the line.  If Wu acknowledged that he, Eargo, or others engaged in misconduct, it

would undermine Wu and Maveron's credibility and weaken their ability to attract future business.

143.    Wu, as a director of Eargo, was required to, but failed: (1) to implement and

maintain an effective system of internal controls designed to ensure the Company's compliance

with laws, rules, and regulations governing Eargo's core operations; (2) to implement and maintain

an effective system of internal controls over financial reporting and public statements made by the

Company's officers; (3) to implement and maintain effective internal controls and corporate

governance practices and procedures to effectively oversee the material risks posed to the

Company; and (4) to investigate and take action when presented with red flags that the internal

controls over the Company's insurance claim process and financial reporting were inadequate.

---

[28]    *See* 2021 Proxy Statement p. 7.

[29]    *See* Ingrassia, at pp. 95-96.  As Florent Michel, a founder of Eargo, stated at the time: "When you talk to investors about a new hearing aid, it's like, 'There are a lot of dead bodies along the road.'  The history of hearing aids is that people have tried and failed."

[30]    *See* Michael Sherman, GEEKWIRE, https://www.geekwire.com/2015/maveron-backed-eargo-looks-to-reinvent-the-hearing-aid-with-rechargeable-devices-modeled-on-a-fishing-fly/ (last visited Nov. 17, 2021).

[31]    *See* Lawrence Ingrassia, BILLION DOLLAR BRAND CLUB (2020), pp. 97-99.

[32]    Gormsen convinced the group of investors, including Maveron and NEA, to put at least another $20 million into the Company to turn things around.  *See* Geoff Pardo (2021), https://medtechconference.com/media/medtech-talk-podcast/now-hear-this-christian-gormsen-on-breaking-convention-in-the-hearing-industry-at-eargo and accompanying audio at 33:00-33:30 (last accessed Nov. 17, 2021).

144.    Wu was required to investigate and take action to prevent damage to Eargo, its shareholders, and customers, but failed to take timely action, ignoring all the red flags, including an ongoing material weakness in the internal controls over financial reporting and a growing accounts receivable balance.  Had Wu taken timely action the damage caused to Eargo could have been prevented or minimized.

145.    As a member the Audit Committee, Wu had duties regarding oversight of the risks facing the Company and Eargo's compliance with relevant laws, rules, and regulations.  Wu utterly failed to perform these essential duties.

146.    Wu is not independent and faces a substantial likelihood of liability for his breaches of fiduciary duty and violations of Federal securities laws.  Any demand upon Defendant Wu is futile and, thus, excused.

**I.    Other Factors Demonstrating That Demand Upon The Individual Defendants Is Excused**

147.    Eargo has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing.  Yet, the members of the Board have not filed any lawsuits or taken any action against those responsible for the wrongful conduct.

148.    Additionally, lawsuits by the current directors of Eargo to remedy the wrongs complained of herein would expose several the Individual Defendants to liability for violations of the Federal securities laws in the pending Securities Class Actions.  If the Board elects for the Company to press forward with its right-of-action against many of the Individual Defendants in this Action, then Eargo's efforts would compromise its defense of the Securities Class Actions. Accordingly, demand on the Board is excused.

149.    The members of the Board received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have thus benefited from the wrongs herein alleged and have engaged therein to preserve their positions of control and the perquisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this Action.

150.    Upon information and belief, Eargo has Directors & Officers Liability Insurance ("D&O Insurance") policies that contain provisions that would eliminate coverage for any action brought by the Individual Defendants against each other, known as the "insured versus insured exclusion."

## VII.    CLAIMS FOR RELIEF

## FIRST CLAIM

### Against the Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

151.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

152.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants.  Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the Section 14(a) non-fraud claims.

153.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

154.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

40

155.     The Proxy Statement contained the false and misleading statements related to risk oversight by the Board and the Company's commitment to strong corporate governance principles. Contrary to these statements, the Board was required to, but failed: (1) to implement and maintain an effective system of internal controls designed to ensure the Company's compliance with laws, rules, and regulations governing Eargo's core operations; (2) to implement and maintain an effective system of internal controls over financial reporting and public statements made by the Company's officers; (3) to implement and maintain effective internal controls and corporate governance practices and procedures to effectively oversee the material risks posed to the Company; and (4) to investigate and take action when presented with red flags that the internal controls over the Company's insurance claim process and financial reporting were inadequate.

156.     In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2021 Proxy Statement were materially false and misleading.  These misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statement, including, but not limited to the election of directors and ratification of an independent auditor.

157.     The false and misleading statements and material omissions in the Proxy Statement led to the re-election of Gormsen, Hughes, and Wu, which allowed them to continue breaching their fiduciary duties to Eargo.

158.     The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statement.

159.     Plaintiff on behalf of Eargo has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duty

160.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

161.    Each Individual Defendant owed to the Company the duty to exercise good faith, loyalty, candor, and due care in the management and administration of Eargo's business and affairs.  The Board also had specific duties pursuant to the Company's corporate governance practices and procedures that, had they been discharged in accordance with the Board's obligations, would have prevented, or at least minimized, the misconduct and consequential harm to Eargo alleged herein.

162.    The Individual Defendants each violated their fiduciary duties to Eargo and its stockholders by, among other things, failing to: (1) implement and maintain an effective system of internal controls designed to ensure the Company's compliance with laws, rules, and regulations governing Eargo's core operations; (2) implement and maintain an effective system of internal controls over financial reporting and public statements made by the Company's officers; (3) implement and maintain effective internal controls and corporate governance practices and procedures to effectively oversee the material risks posed to the Company; and (4) investigate and take action when presented with red flags that the internal controls over the Company's insurance claim process and financial reporting were inadequate.

163.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Eargo has sustained and continues to sustain significant damages and its business and reputation have been irreparably damaged.

164.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.  Plaintiff on behalf of Eargo has no adequate remedy at law.

## **THIRD CLAIM**
### **Against the Individual Defendants for Waste of Corporate Assets**

165.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

166.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have subjected Eargo to substantial liability, irreparably damaged the Company's business and reputation, and wasted corporate assets.

167.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

168.    Plaintiff on behalf of Eargo has no adequate remedy at law.

### FOURTH CLAIM

**Against the Individual Defendants for Aiding and Abetting**

169.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

170.    The Individual Defendants are each in breach of their fiduciary duties to the Company and have participated in such breaches of fiduciary duties.

171.    In committing the wrongful acts pled herein, each of the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct.  In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided and abetted, and/or assisted, each other in breaching their respective duties.

172.    Because the actions described herein occurred under the Board's supervision and authority, each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

173.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.

## VIII.    PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Eargo, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Eargo;

(c)    Declaring that the Individual Defendants violated Section 14(a) of the Exchange Act;

1    (d)    Determining and awarding to Eargo the damages sustained by it as a result of the

2    violations set forth above from each of the Individual Defendants, jointly and severally,

3    together with pre-judgment and post-judgment interest thereon;

4    (e)    Directing Eargo and the Individual Defendants to take all necessary actions to

5    reform and improve its corporate governance practices and procedures and internal control

6    systems to comply with all applicable laws, rules, and regulations and to protect Eargo and

7    its shareholders from a repeat of the damaging events described herein;

8    (f)    Awarding Eargo restitution from Individual Defendants, and each of them;

9    (g)    Awarding Plaintiff the costs and disbursements of this Action, including reasonable

10    attorneys' and experts' fees, costs, and expenses; and

11    (h)    Granting such other and further relief as the Court may deem just and proper under

12    the circumstances.

13 **IX.**    **JURY DEMAND**

14    Plaintiff hereby demands a trial by jury.

15 Dated: December 3, 2021        **WEISSLAW LLP**

16        By:   <u>/s/ Joel E. Elkins</u>
17              Joel E. Elkins (SBN 256020)
              611 Wilshire Blvd., Suite 808
18              Los Angeles, CA, 90017
              Telephone: 310/208-2800
19              Facsimile: 310/209-2348

20              -and-

21        **WEISSLAW LLP**
              David C. Katz
22              Mark D. Smilow
              Joshua M. Rubin
23              305 Broadway, 7th Floor
              New York, NY 10007
24              Telephone: (212)682-3025
              Facsimile: (212)682-3010
25              Email: dkatz@weisslawllp.com
                     msmilow@weisslawllp.com
26                     jrubin@weisslawllp.com

        *Attorneys for Plaintiff*

27

28              44